# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 08 2018, 7:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald J. Frew
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Patricia C. McMath
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of J.W., Mother, and T.W. and L.W., Minor Children:[1]

J.W.,

*Appellant-Respondent,*

November 8, 2018

Court of Appeals Case No.
18A-JT-981

Appeal from the
Allen Superior Court

The Honorable
Charles F. Pratt, Judge

---

[1] The Indiana Department of Child Services filed a petition to terminate Mother's parental rights to each of her four children—I.W. (Cause No. 02D08-1701-JT-17); G.W. (Cause No. 02D08-1701-JT-18); T.W. (Cause No. 02D08-1701-JT-19); and L.W. (Cause No. 02D08-1701-JT-20). The juvenile court heard all four cases simultaneously and terminated Mother's rights to her daughters, T.W. and L.W., but declined to terminate Mother's rights to her sons, I.W. and G.W. Accordingly, Mother does not appeal the part of the juvenile court's order pertaining to I.W. and G.W.

v.

Indiana Department of Child Services,

*Appellee-Petitioner*.

**Kirsch, Judge.**

[1]     J.W. ("Mother") appeals the juvenile court's order terminating her parental rights to her minor daughters, T.W. and L.W.[2]  Following various hearings, the juvenile court terminated Mother's parental rights to her daughters but did *not* terminate her parental rights to her two minor sons, I.W. and G.W.  This case presents a most unusual circumstance, albeit not without precedent,[3] where, in the same proceeding, the juvenile court terminated a mother's rights to some but not all of her children.  Mother raises the following restated issue for our review:  whether the juvenile court's order terminating her parental rights to just two of her four children was clearly erroneous because it was not supported by

---

[2] The juvenile court's order is dated March 16, 2016; however, the CCS for T.W. and L.W. includes the correct date of March 16, 2018.  *Appellant's App. Vol. II* at 2, 11, 28.

[3] *See In re I.A.*, 903 N.E.2d 146 (Ind. Ct. App. 2009) (affirming juvenile court's termination of mother's parental rights to one of her five children in the same proceeding during which the juvenile court did not terminate the mother's parental rights to her remaining four children).

sufficient evidence that the termination was in the best interests of her daughters.

[2]     We affirm.

## Facts and Procedural History

[3]     Mother has two biological sons, I.W., born June 6, 2008, and G.W., born May 18, 2009 (together, "Sons"), and two biological daughters, T.W., born May 6, 2011, and L.W., born March 2, 2012 (together, "Daughters") (collectively, "Children"). The Indiana Department of Child Services ("DCS") became involved with Mother in January 2014 when L.W. almost drowned in the family's bathtub while Sons were giving her a bath. At that time, Mother lived with Children and T.E.W. ("Father"), her then-husband and Children's biological father, in their home in New Haven, Allen County.[4] Mother, who worked the third shift, returned home from work one morning and, believing that Father had taken Children to the babysitter, she fell asleep around 9:00 a.m., leaving Children unsupervised. Later, I.W. woke up Mother saying that G.W. had L.W. in the bathtub, and that she was going to die. In the bathroom, Mother found L.W. on her back, purple in color, and cold to the touch; fortunately, L.W. survived.

---

[4] T.E.W., the father of the four siblings, signed a "Voluntary Relinquishment of Parental Rights" for each child on September 27, 2017, and he does not take part in this appeal. *Respondent's Exs*. A, B, C, and D. Accordingly, we include facts about Father only as they are relevant to the termination of Mother's parental rights.

[4] DCS filed a petition claiming that each child was a Child in Need of Services ("CHINS"). On January 14, 2014, a preliminary inquiry on the CHINS allegations was held. Children were adjudicated CHINS and placed in relative care. A dispositional order, including a "20-point Parent Participation Plan," was entered on February 11, 2014. *Appellant's Br.* at 7. The participation plan required Mother to abide by the standard nine participation plan requirements, *i.e.*: (1) refrain from criminal activity; (2) maintain clean, safe, appropriate, and sustainable housing; (3) notify DCS within forty-eight hours of changes in household composition, housing, and employment; (4) cooperate with caseworkers, the court-appointed special advocate ("CASA"), and the guardian ad litem ("GAL"); (5) attend case conferences as directed, maintain contact, and accept announced and unannounced home visits by caseworkers and the GAL; (6) provide caseworkers with accurate information regarding paternity, finances, insurance, and family history; (7) provide caseworkers and the GAL with signed and current consents of release and exchange of information; (8) provide each child with clean, appropriate clothing; and (9) cooperate with rules of each child's placement. *Appellant's App. Vol. II* at 24. Mother was also required to: submit to and follow directions of a "Diagnostic evaluation"; obtain and keep employment; enroll in home-based services; visit Children; refrain from smoking in the presence of Children; participate in family therapy; follow recommendations of the Three Wishes program for G.W.; and follow recommendations of the First Steps developmental program for Daughters. *Id.* Through her participation, Mother earned unsupervised visits with Children.

[5]    At some point during the case, Mother was fired from her job when she arrived at work drunk. In December 2015, a second incident occurred when, during an unsupervised visit with Mother, L.W. spilled hot cocoa on herself; the cocoa ran down L.W.'s leg and into her boot, resulting in a burn. *Tr. Vol. 2* at 41-42. Mother took L.W. to the emergency room. *Id*. L.W. made a full recovery; however, this incident resulted in Mother being returned to supervised visitation with Children. *Id*.

[6]    A permanency hearing was held on February 23, 2017, and the juvenile court adopted a plan for the termination of parental rights for each child. Children continued in licensed foster care, with Daughters together in the home of Stephanie Long ("Long") and Sons together in a separate home. *Id*. Hearings on the termination of parental rights were conducted in 2017 on August 7, 8, 14, and 29, and December 4 and 6. *Id*. at 2-3, 11-12. During the hearings, the transcription of which consisted of more than 550 pages, the juvenile court heard testimony from, among others, Mother; Father; Rachel Morrison with Children First Center; Kimberly Griffith with Functional Oral Motor and Feeding Concepts; Daughters' foster mother Stephanie Long; Sons' foster mother Tyra Watson; CASA volunteer Jo Willer; Rachel Schwieterman,[5] who oversaw Children's supervised visitation for DCS; Teresa Jones, an employee with Charis House at the Rescue Mission; Denise Wells, a licensed social

---

[5] While the transcript also includes the spelling "Schweiterman," *Tr. Vol. 4* at 26, 61, the correct spelling is "Schwieterman." *Tr. Vol. 2* at 210.

worker for Northeastern Center; Stephanie Adams, a DCS team leader at Northeastern Center; Laura Swanson ("Swanson"), a therapist at Park Center who worked with G.W.; Julia McIntosh ("CASA McIntosh"), Director of the Allen County CASA; Marla Souder ("Dr. Souder"), clinical psychologist with ICAN and Payton Place; and Jenelle Vanderpool ("FCM Vanderpool"), family case manager for DCS.

[7] Regarding special needs, Dr. Souder testified that I.W. has been diagnosed with: Schizoaffective Disorder; Attention Deficit/Hyperactivity Disorder ("ADHD"); Obsessive Compulsive Disorder ("OCD"); Sensory Integration Disorder; and Posttraumatic Stress Disorder ("PTSD"). *Tr. Vol. 3* at 222; *State's Ex. 20* at 16. Dr. Souder and Swanson testified that I.W.'s behavior reflects a departure from reality; he sometimes barks like a dog when he is anxious or uncomfortable. *Tr. Vol. 3* at 95, 222. Regarding G.W., Dr. Souder testified that he suffers from ADHD, OCD, Sensory Integration Disorder, and PTSD. *State's Ex. 19* at 13; *Tr. Vol. 3* at 232-33. Swanson testified that G.W. has Generalized Anxiety Disorder and "Disruptive Behavior Disorder NOS." *Tr. Vol. 3* at 80. T.W. has vision problems and needs glasses, she suffers from "geographical tongue,"[6] and has Attention Deficit symptoms, which interfere with her ability to concentrate. *Tr. Vol. 2* at 29. L.W. has scoliosis and must wear braces on her legs to walk and attend physical therapy. Michelle Berry, an occupational

---

[6] Mother described that with "geographical tongue," T.W. has "white spots that move around in her mouth and anything citrusy burns it so like she will tell you she cannot have pineapple because it catches her mouth on fire." *Tr. Vol. 2* at 28. Mother explained that this condition affects T.W.'s eating. *Id.*

therapist, testified that L.W. "looks like to me that she's got symptoms, um, Fetal Alcohol Syndrome. . . . [S]he has difficulty staying on task. She has difficulty problem solving. She has poor carryover from week to week with different things." *Id.* at 78. Berry testified that L.W. trips and falls, and in the beginning, she would walk into the walls. *Id.* "I give them a task and they carry it through and she cannot. You have to que her up on a task to complete. Her – she just has a variety of challenges." *Id.*

[8] Swanson testified that "[G.W.] has affection towards [I.W.] and can also be frustrated by I think normal sibling differences that come up. [I.W.] is more indifferent to [G.W.] but does verbalize loving his brother." *Tr. Vol. 3* at 93. Swanson also testified that G.W. loves his parents and talked about "wanting to see his mom" and "be able to live with her." *Id.* at 84. Regarding T.W., Mother testified that "lately she's been basically telling me that she hates me, that she doesn't love me." *Tr. Vol. 2* at 29. Foster mother Long testified that she takes Daughters to about six appointments a month for issues of mental health and occupational therapy. *Id.* at 105-06. Long also testified that she has a good relationship with Daughters and is interested in adopting them. *Id.* at 111. During the more than three years that Children were out of Mother's care, both Sons lived together in a separate home from Daughters, who also lived together. *Tr. Vol. 2* at 171-72. CASA McIntosh testified that it was in the best interest for Mother's rights to be terminated as to Children. CASA McIntosh also testified that the case has been open since 2014, and Children have needs and require supervision. *Tr. Vol. 3* at 149-50.

[9]     On March 16, 2018, the juvenile court entered its order and made the following findings, none of which Mother challenges on appeal:

> 8. In the present underlying CHINS cases, the [C]hildren have been placed outside the care of the [M]other for a period of more than six (6) months since the entry of the Dispositional Decree. The two brothers have lived separately from their sisters since 2014.
>
> 9. Early in the case the Mother [voluntarily] entered into a residential treatment program through the Charis House. She did not complete the program because, as she testified, she did not believe in God and [did] not feel that the Charis House was a "good fit" for her.
>
> 10. From the testimony of Teresa Jones of the Charis House, the Court finds that the [M]other resided in the residential program from April 22, 2015 until February 3, 2016. A goal of reunification was established. Therapies to address alcohol dependency, sexual addictions, and the impact of the [M]other's childhood were recommended. The Court finds from Ms. Jones['s] testimony that the Mother voluntarily chose to leave the Charis House Program because she was asked to participate in therapies designed to address her sexual addiction and past trauma (fears).
>
> 11. The Mother testified that on August 7, 2017[,] she had completed nine parenting classes at Children's First Care in Auburn, Indiana. From the testimony of Rachel Morrison of the Children's First Center, the Court finds that the Mother completed the ten-week parenting program on June 16, 2016. However, the counseling services recommended additional services for the Mother. The Mother's evaluation scoring declined after the course completion, a circumstance only seen one other time by the therapist.

12. The Mother also testified that she had completed drug counseling but was still in individual therapy.

13. Beginning on May 28, 2016, the Mother participated in individual therapy. From the testimony of therapist Denise Wells the Court finds that the Mother participated in weekly sessions for about six to seven months. She now attends on an every-other week basis. Issues of trauma are explored in therapy. The therapist believes that the Mother has an understanding of the trauma issues. She believes that the Mother will require additional support to aid in the transition should the children be returned to her care. As of August 8, 2017, the therapist found no reason to withhold reunification of the children with their mother. However, if reunited, the [M]other would benefit from and need home based services.

14. The Mother testified that she completed a violence abatement program. From the testimony of Stephanie Adams, a therapist with the Northeastern Center, the Court finds that additional services were not needed for the [M]other. The Mother has completed anger management therapy.

15. The Mother continues to visit[] the children under the supervision of SCAN, a local agency contracted by the [DCS] for that service. From the testimony of Rachel Schwieterman of SCAN, the court finds that she has supervised the Mother's visits since September 19, 2016. The Mother demonstrates appropriate discipline methods and applies the "123 Magic" technique. Ms. Schwieterman reserved judgment on the expansion of the Mother's visits until such time as she could observe the [M]other's interaction with them in a less structured environment. She communicates appropriately with the [C]hildren. The [C]hildren love her.

16. The Mother is employed and works third shift. She has transportation and has a home.

17. The children each have special needs.

18. From the testimony of licensed clinical psychologist Marla Souder the Court finds that the child, [G.W.], carries a diagnosis of Attention Deficit Hyperactivity Disorder, Obsessive Compulsive Disorder, sensory degeneration and post-traumatic stress disorder. That said, [G.W.] has a lot of positive strengths. The child, [I.W.], has low muscle tone and is within the low-level autism spectrum that includes a sensory integration disorder. He exhibits a schizoaffective disorder that manifests with behaviors that depart from reality, including barking like dog. He requires therapy, school supports, and serious stability. He needs a safe space that limits exposure to trauma.

19. Speech pathologist and feeding therapist Kimberly Griffith has provided treatment for the [C]hildren. From her testimony the court finds that [I.W.] has made significant improvement. [G.W.] is also ready for discharge. [T.W.] and [L.W.] have been discharged successfully but have recently been referred for therapy to address emotional issues.

20. Park Center therapist Laura Swanson provided therapeutic services to [G.W.] beginning in May or June [of] 2014 to address anxiety and disruptive behaviors. She testified (August 2017) that his anxiety comes in waves and he is anxious about his future and permanent living situation. [G.W.] loves his parents and brother but is disconnected from his sisters. He wants to live with his [M]other. He is not able to properly interact with animals. [I.W.] also suffers from anxiety. He demonstrates odd behaviors including outbursts of growling and barking. She opined that reunification will come as a "shock" and transitional services will be required.

21. [G.W.] was in foster care with Tyra Watson from October 2014 until July 2016. [I.W.] was in her care from July 2015 until July 2016. They were returned to her care in July 2017. When first in her care [G.W.] struggled academically. [I.W.] did not start therapy until after his placement. She believes that both children lie. The boys get along well together. She has observed that the [M]other has been appropriate with the children.

22. Since 2014, foster parent Stephanie Long, has cared for the daughters, [L.W.] and [T.W.]. When first in her care [L.W.] could barely walk. She has had to have braces on her feet. The girls would hoard food. They receive occupational therapy and have made improvements.

23. The two daughters are in therapy with Three Wishes once a week, individual therapy at Park [C]enter once a week, and occupational therapy twice a week. [L.W.] needs to be seen at Riley Children Hospital to address her scoliosis. [T.W.] has expressed to her foster mother that she wants to remain with her.

24. Should parental rights be terminated, [DCS] has an appropriate plan for two of the children, that being adoption. Foster parent Stephanie Long has expressed an interest to adopt the two daughters. No adoptive home has yet been located for the boys.

25. From the testimony of Janelle Vanderpool,[7] the [DCS]'s case manager, the Court finds that the Mother has become more self-aware and has made progress. However, the case manager believes the Mother requires additional services before

---

[7] In the record before us, FCM Vanderpool's name is also spelled, "Jenelle." *Tr. Vol.* 3 at 244.

reunification can be achieved and asserts that the Mother has progressed as far as her cognitive abilities will allow.

26. The Court finds from the children's Court Appointed Special Advocate volunteer, Jo [W]iller,[8] that [T.W.] and [L.W.] have improved since being in foster care. She asserts that the [M]other is able to meet the [C]hildren's needs in a structured environment. She observed the [M]other applying 'canned' responses for discipline that were lacking a nurturing component. Particularly the nurturance was absence [sic] with regard to [T.W.] The CASA Staff representative, Julia McIntosh[,] testified that there has been provision of extensive services over a long period of time and the Mother has not yet demonstrated a full range of benefits sufficient to meet the level of need required for the [C]hildren. Thus, CASA has concluded that the [C]hildren's. best interests are served by the termination of parental rights.

*Appellant's App. Vol. II* at 24-26.

[10] Based on the above findings, the juvenile court terminated Mother's parental rights to Daughters but not to Sons. The juvenile court reasoned:

1. For parental rights to be involuntarily terminated the [S]tate must prove by the clear [sic] and convincing evidence that the children have been removed from the parent for at least six (6) months under a dispositional decree . . . . In the present case the children have been placed outside the care of [Mother] under a Dispositional Decree for more than six (6) months prior to the filing of the petition to terminate parental rights.

---

[8] The juvenile court used the name Jo "Miller"; however, the CASA's name is Jo "Willer." *Tr. Vol. 2* at 144.

2. . . . . By the clear and convincing evidence, the court determines that there is a reasonable probability that reasons that brought about the children's placement outside the home will not be remedied for the two daughters [T.W. and L.W.]. In this present case, the children have significant chronic conditions that require on-going services. The immediate reunification of four such children into the care of a mother, who has not yet demonstrated an ability to meet such needs outside of a professionally structured environment, cannot safely be accomplished. The two younger daughters are bonded to their foster mother where they have prospered. The elder boys are not significantly bonded to their sisters but love and desire reunification with [Mother]. Because of the [M]other's limitations (see the testimony of the CASA volunteer, the foster mother, and Denise Wells' testimony), the Mother is not likely to gain the ability to meet the extraordinary therapeutic and treatment schedule required for the four children, meet their individual behavioral and emotional demands, and maintain a household.

3. . . . . In this case the [CASA] has concluded that termination of parental rights is in the children's best interests. The children need a safe stable and nurturing home environment. If parental rights are terminated with regard to [T.W.] and [L.W.], they would be provided, through adoption, with a parent who has demonstrated the present ability and means to meet their special needs on a sustainable, permanent basis. In contrast, [I.W.] and [G.W.] do not have a present home in which permanency could be established excepting the home of their mother. The Court finds from the totality of the evidence that the Mother is readily able to meet the emotional and behavioral needs of the boys. Separation of the siblings, while generally not a tenable position, is appropriate in this case. Therapist Laura Swanson testified and the Court found that the boys are detached from their sisters but are bonded to one another. Similarly, the girls are bonded to each other and their foster parents. Termination of parental

> rights with regard to [T.W.] and [L.W.] serves their best interest.
> The best interests of [G.W.] and [I.W.] are not so served.

*Appellant's App. Vol. II* at 27.  Mother now appeals the termination of her parental rights to Daughters.

## Discussion and Decision

"Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make.  They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]"  *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014).  While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise her children, the law allows for the termination of those rights when a parent is unable or unwilling to meet her responsibility as a parent.  *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*.  That is, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship.  *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).  The purpose of terminating parental rights is not to punish the parent but to protect the child.  *In re T.F.*, 743 N.E.2d at 773.  Termination of parental rights is proper where the child's emotional and physical development is threatened.  *Id.*  The juvenile court need not wait until the child is irreversibly harmed such that her physical, mental, and social

development is permanently impaired before terminating the parent-child relationship. *Id.*

[12]     When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* at 148-49. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[13]     When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Matter of G.M.*, 71 N.E.3d 898, 904-05 (Ind. Ct. App. 2017) (citing *Bester*, 839 N.E.2d at 147). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* at 905. "'Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference.'" *Id.* (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996)). "If the evidence and inferences support the juvenile court's decision, we must affirm." *Id.*

[14]     To terminate a parent-child relationship, DCS must file a petition that alleges and proves:

(A) that one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must provide clear and convincing proof of these allegations. *Matter of G.M.*, 71 N.E.3d at 903. "Because parents have a constitutionally protected right to establish a home and raise their children, the State 'must strictly comply with the statute terminating parental rights.'" *Id.* (quoting *Platz v. Elkhart Cty. Dep't of Pub. Welfare*, 631 N.E.2d 16, 18 (Ind. Ct. App. 1994)).

[15] Mother does not challenge the juvenile court's factual findings. As such, she has waived any argument relating to these unchallenged findings and, therefore, they stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (providing that failure to challenge findings resulted in waiver of argument that findings were clearly erroneous), *trans. denied*. Likewise, Mother does not dispute the juvenile court's conclusions that: (1) prior to termination, Daughters had been removed from Mother's care for at least six months under a dispositional decree; (2) there is a reasonable probability that reasons that brought about Daughters' placement outside the home will not be remedied; and (3) there is a satisfactory plan for the care and treatment of Daughters. *Appellant's App. Vol. II* at 27. Instead, Mother's sole argument is that the termination of Mother's parental rights is not in Daughters' best interests.

[16] Mother argues that she made continuous, dedicated efforts to cooperate and comply with the juvenile court and DCS in order to have Daughters returned to her care. She notes that she "did such a good job that the court determined that

[she] was readily able to meet the emotional and behavioral needs of the [Sons]." *Appellant's Br.* at 13 (citing *Appellant's App. Vol. II* at 27). This is why Mother contends she is capable of caring for Daughters. *Tr. Vol. 2* at 44-45. Mother's assurances notwithstanding, Mother does not dispute the juvenile court's conclusion that,

> The immediate reunification of four such children into the care of a mother, who has not yet demonstrated an ability to meet such needs outside of a professionally structured environment, cannot safely be accomplished. [Daughters] are bonded to their foster mother [Long] where they have prospered. [Boys] are not significantly bonded to their sisters but love and desire reunification with [Mother]. Because of the [M]other's limitations (see the testimony of the CASA volunteer, the foster mother, and Denise Wells' testimony), the Mother is not likely to gain the ability to meet the extraordinary therapeutic and treatment schedule required for the four children, meet their individual behavioral and emotional demands, and maintain a household.

*Appellant's App. Vol. II* at 27.

[17] Mother also does not challenge the juvenile court's conclusion that Daughters need a safe, stable, and nurturing home environment.

> If parental rights are terminated with regard to [T.W.] and [L.W.], they would be provided, through adoption, with a parent who has demonstrated the present ability and means to meet their special needs on a sustainable, permanent basis. In contrast, [I.W.] and [G.W.] do not have a present home in which permanency could be established excepting the home of their mother. The Court finds from the totality of the evidence that the Mother is readily able to meet the emotional and behavioral

needs of the boys. Separation of the siblings, while generally not a tenable position, is appropriate in this case. Therapist Laura Swanson testified and the Court found that the boys are detached from their sisters but are bonded to one another. Similarly, the girls are bonded to each other and their foster parents. Termination of parental rights with regard to [T.W.] and [L.W.] serves their best interest. The best interests of [G.W.] and [I.W.] are not so served.

*Appellant's App. Vol. II* at 27. Long testified that it was her desire to adopt the Daughters and that she had already completed all of her adoption classes to do so.[9] *Tr. Vol. 2* at 111.

[18] Mother reiterates that the involuntary termination of parental rights is an extreme measure, designed to be used only as a last resort when all other reasonable efforts have failed. We agree. Here, the near-drowning of L.W. prompted DCS to remove Children from Mother's care. Once removed, DCS determined that Children had special needs, which required counseling and on-going services. Mother cooperated with DCS, she completed parenting classes, and participated in, among other activities, an anger management class, an alcohol treatment program, individual therapy, and visitation with Children. However, while the juvenile court concluded that Mother had improved

---

[9] Mother argues that Long had no interest in the goal of reunification for Daughters. *Appellant's Br.* at 14. Assuming without deciding that this was true, Mother's rights were terminated not because of Long's position on reunification, but because it was determined that Daughters had been out of Mother's care for more than six months, the reasons for placement outside the home of the parents will not be remedied, removal of Children was in their best interests, and the State had a satisfactory plan for their care and treatment. Ind. Code § 31-35-2-4(b)(2).

enough to care for two children, it determined that she could not address the needs of and care for four special needs children. Accordingly, the juvenile court was faced with the difficult question of whether Mother's inability to care for two of her children meant that her rights would have to be terminated as to all four children.

[19] In determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). In making this determination, the juvenile court must subordinate the interests of the parent to that of the child involved. *Matter of G.M.*, 71 N.E.3d at 903. The court need not wait until a child is harmed irreversibly before terminating the parent-child relationship. *In re J.S.*, 906 N.E.2d at 236. The recommendation of a DCS case manager and CASA to terminate parental rights, in addition to evidence the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. *Id.*

[20] Mother challenges the trial court's decision to terminate her parental rights to Daughters while not terminating her rights to Sons, suggesting that if the evidence is not sufficient to terminate as to Sons, it cannot be sufficient to terminate Mother's rights as to Daughters. Noting that Sons' and Daughters' situations were not the same, we disagree. Here, the trial court did not conclude that DCS failed to prove all the elements required to terminate Mother's rights to Sons; rather, the trial court specifically found that DCS had

not proven an adequate plan of permanency for Sons. That finding alone precluded termination of Mother's parental rights to Sons because it also served as the basis for the juvenile court's conclusion that termination was not in Sons' best interests.

[21] While such a disposition is rare, in *In re I.A.*, 903 N.E.2d 146 (Ind. Ct. App. 2009), we affirmed a juvenile court's determination to terminate a mother's parental right to one of her five children, while not terminating her parental rights to her other four children. We found the following evidence was sufficient to support the trial court's determination that termination of mother's parental rights as to the one child was in child's best interests: (1) child had never been in his mother's care and he had never been with his siblings on a day-to-day basis; (2) child had been in the care of the same licensed foster parents with whom he had forged a strong bond and who were responsible for taking him to his doctor and therapy appointments; and mother had shown indifference to child since before he was even born. Like the child in *I.A.*, T.W. was in Mother's care for two and a half years, and L.W. was in Mother's care for twenty-two months. At the time of the final termination hearing, Daughters had lived together in Long's care for more than three years, which was at least half their lives. Long and Daughters were bonded, and Long provided Daughters with the necessary treatment for their special needs. Therapist Laura Swanson testified, and the Court found, that Sons are bonded to each other but detached from Daughters. *Tr. Vol. 3* at 85. Similarly, Daughters are bonded to each other and their foster mother. Long expressed a desire to adopt Daughters

and T.W. expressed a desire to remain with Long. *Tr. Vol. 2* at 111, 117. The juvenile court recognized that "[s]eparation of the siblings, while generally not a tenable position, is appropriate in this case." *Appellant's App. Vol. II* at 27. It was not clearly erroneous for the juvenile court to determine that termination of Mother's parental rights to Daughters was in their best interests.

Affirmed.

Vaidik, C.J., and Riley, J., concur.